UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:03CR228 (JCH) |
| | : | |
| v. | : | |
| | : | |
| RAYMOND DELVECCHIO, JR | : | |
| | : | February 18, 2005 |

**THE GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Sentencing is scheduled in this matter for February 23, 2005 at 9:00 a.m. This memorandum is submitted to attempt to limit the issues for sentencing. The memorandum is divided into several sections <u>First</u>, it outlines the apparent procedure to be followed in sentencings in the wake of *United States v. Booker*, 125 S. Ct. 738 (2005). <u>Second</u>, it addresses the guidelines calculations. <u>Third</u>, it addresses departure issues. <u>Fourth</u>, it addresses the government's anticipated presentation of evidence at sentencing.

**I.      Sentencing in the Wake of *Booker***

In *United States v. Booker*, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will

be subject to appellate review for "reasonableness." *Id.* at *24.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of *Booker*. In *United States v. Crosby*, No. 03-1675 (2d Cir. Feb. 2, 2005), the Court summarized the impact of *Booker* as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). ***Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range,*** or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. ***Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.*** Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Slip op. at 24-25 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before *Booker/Fanfan*." *Id.* at 20; *see id.* at 19. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines

2

sentence, regardless of which of the two ranges applies." *Id.* at 21. Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." *Id.* In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a)

calculus. Writing for the remedial majority in *Booker*, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, *must* consult those Guidelines *and take them into account* when sentencing." 2005 WL 50108 at *27 (emphasis added). As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, slip op. at 18.

> [I] is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

*Id.* at 25.

In the vast majority of cases, a sentence consistent with the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g., Booker*, 2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at *19 (same) ("Congress' basic statutory goal -- a system that diminishes

4

sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). *See also United States v. Wanning*, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), not least of which are the nature and circumstances of the offense (which are covered thoroughly in Chapters 2 and 3 of the Guidelines Manual), the history and characteristics of the defendant (which are covered in Chapter 4 with respect to criminal history and Chapter 5 with respect to departures based on the most commonly considered personal characteristics), and the need to provide restitution to victims (Chapter 5, Part E).

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing outlined in § 3553(a), and should occur absent unusual circumstances. *See Wanning*, slip op. at 8-9 (concluding that "judges should, in the exercise of their newly minted discretion,

normally follow the Guidelines, and the ranges produced by them, because that approach represents the best (though an imperfect) method of sentencing"). The government commends to the Court's attention the scholarly opinions of Judge Cassell in *United States v. Wilson*, 2005 WL 78552 (D. Utah Jan. 13, 2005) ("*Wilson I*"), and No. 2:03-CR-00882 PGC (D. Utah Feb. 2, 2005) ("*Wilson II*"), available at http://www.utd.uscourts.gov/reports/wilson2.pdf, which reach this same conclusion. As Judge Cassell explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to accord with legislatively determined policies. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.

  Judge Cassell further observed that the Guidelines provide appropriate guidance, which is fully consonant with legislative policy, as to when particular offender characteristics properly factor into the sentencing calculus -- for example, forbidding consideration of factors such as race, religion, or socioeconomic status, and assigning only modest weight to factors such as family ties, age, and civic contributions. *Wilson II*, slip op. at 17. Importantly, Judge Cassell properly concluded that one of the primary goals of the criminal sentencing system is "equal justice under the law -- with a sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders." *Id.* at 31. "The only realistic way to insure this is to

follow generally the Guidelines." *Id.*

This case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Therefore, the government respectfully recommends that the Court sentence the defendant consistent with the Guidelines in the manner discussed below.

## II. The Guidelines Calculation

The PSR adopts a Guidelines calculation resulting in a total offense level of 32, a criminal history category III and a sentencing range of 151-188 months. This calculation is higher than the total offense level of 29 proposed by the parties. The only difference between the parties' calculation[1] and the PSR is whether a three-level enhancement is warranted for official victim under U.S.S.G. § 3A1.2(a). The following is a brief explanation why we would respectfully object to the three-level enhancement and instead request the Court to adopt the Guidelines calculation agreed to by the parties.

Because Count Three (the threatening to murder a law enforcement officer) embodies conduct that is treated as an adjustment -- an obstruction enhancement -- to Counts Eight

---

[1] The parties have set forth their agreed-upon Guidelines calculation in the plea agreement, which would result in a total offense level of 29, a Criminal History category III, and a Guidelines sentencing range of 108-135 months incarceration and a fine of $15,000 to $150,000. The parties also agreed to recommend a sentence of 135 months if the Court finds no departure applicable on the existing facts. The government also reserved the right to argue for upward departures to 210 months incarceration, and the defendant reserved the right to seek a downward departure on two grounds, overstated criminal history and the defendant's health. In light of the recent Booker decision, the government does not object to the defendant arguing for a reasonable sentence based on factors he deems relevant. That said, the government continues to seek upward departure from the parties agreed upon sentencing range, and requests the court to impose a sentence above the 135 months. Consistent with the plea agreement, the government does not seek a sentence above 210 months.

through Twelve (the gun counts), Count Three is grouped with the gun counts under §3D1.2(c); §3C1.1 (Commentary; Application Notes 8).  Under U.S.S.G. § 3D1.3, if counts are grouped pursuant to 3D1.2(a)-(c),

> the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group.

Id.

Applying § 3D1.3, the government concluded that the Court was required to look at those groups of offenses of conviction that might drive the highest Guidelines calculation, undertake a hypothetical calculation of each group, and pick the calculation that results in the highest offense level.  In this case, we concluded that the potential offenses of conviction in play were either 1) the threatening count or 2) a gun count, as all the gun counts appear would result in the same adjusted offense level.  We then undertook a separate Guidelines analysis for these two "offenses of conviction," using the highest offense level to drive the Guidelines calculation.

The analysis relating to Count Three (the threatening count), as guided by Chapter Two, and Parts A, B, and C of Chapter Three and applicable relevant conduct is as follows: under § 2A6.1, the Guidelines suggested by the Court as potentially applicable to this Count at the time of the guilty plea, the base offense level is 12, a six level adjustment applies for evidencing an intent to carry out the threat, and the offense involved more than two threats, resulting in a two level additional increase.  Three additional levels are added under U.S.S.G. §3A1.2 for a victim-related adjustment (a government officer or employee), resulting in an adjusted offense level of 23.

The analysis relating to the most serious gun count (all appear the same) as guided by

Chapter Two, and Parts A, B, and C of Chapter Three and applicable relevant conduct was the same Guidelines calculations noted in the PSR with the exception of the enhancement for "official victim." There we concluded that the enhancement did not apply to the gun offenses of conviction based upon our reading of the express language of § 3A1.2. That provision requires that the "offense of conviction" is motivated by the defendant's status as an official. Id. In determining the enhancement's applicability, only the "offense of conviction" is considered, *not* relevant conduct. See United States v. Blackwell, 323 F.3d 1256, 1259-1262 (10th Cir. 2003) (not applying official victim enhancement to gun offense) (citing additional cases). We believed that the gun charges, all possessory offenses, did not justify the enhancement. Id. Thus the gun count would result in an offense level of 32. Under the multiple counts analysis using these two groups of counts, the adjusted offense level would be 32, with a total offense level of 29 after giving credit for acceptance of responsibility.

**III.    Departure Issues**

    A. *Upward Departures*

In its objection letter dated November 19, 2004, the government set forth several grounds for upward departure: (1) the present Guidelines calculation does not take into account the serious nature of the threats themselves and that they were directed at an official victim, among others, U.S.S.G. § 5K2.0 & § 5K2.21; and (2) the defendant's criminal history substantially under represents the seriousness of defendant's criminal history and likelihood of recidivism, U.S.S.G. § 4A1.3. To further explain the grounds for these proposed departures, the AUSA King provided an extensive supplemental submission to the Probation Office, dated December 13, 2004, which is attached. The gist of the grounds for upward departure are as follows:

9

*1. Aggravating Circumstances Warranting Upward Departure*

The defendant pled guilty to firearms charges and threatening a government agent. The present Guidelines calculation is, because of the multiple counts analysis, driven by the gun counts, with enhancements based on the number of firearms possessed and the defendant's efforts to obstruct the prosecution of the offense.[2] This simple calculation, and the mere two-level enhancement for obstruction, does not fully take into account the severity of the obstructive conduct in this case. The defendant was not engaged in more benign behavior of altering documents or lying to a government agent, but instead engaged in a concerted effort to kill witnesses, including one who was a known government agent.

To give some perspective on the extent of upward departure that might be appropriate, the government in its December 13 submission outlined how other courts have treated different types of severe obstructive conduct. Id. at 6. An alternative way of analyzing the scope of an appropriate upward departure relating to the severity of the threats would be to consider what type of sentence defendant faced under U.S.S.G. § 2A2.1, the Guideline for attempted murder and a Guideline which the plea agreement at n.1 recognized was potentially applicable, although the parties adopted the more benign threatening Guideline analysis with the government reserving the right to seek an upward departure to 210 months. Under § 2A2.1, the defendant

---

[2] The grouping analysis requires the Court to determine the highest offense level *prior to applicable departures*, and thus the gun counts driven by U.S.S.G. § 2K2.1, not the threatening count driven by U.S.S.G. § 2A6.1, ultimately dictate the sentencing range. However, U.S.S.G. § 2A6.1 (Commentary; Application Note 3) acknowledges that depending on the nature or extent of the threats an upward departure may be warranted. The government submits that the present Guidelines calculation neither takes into account the seriousness of the threats nor that a government official, among others, was the subject of the threats.

would have potentially faced an adjusted offense level of 35 under that section, an adjusted offense level of 37 after application of the grouping rules, and an offense level 34 after acceptance of responsibility. That offense level implicates a sentencing range of 188-235 at a Criminal History category III. In light of the nature of the threat, the government submits that an upward departure to 210 months would be entirely permissible.

This upward departure relating to the obstructive conduct does not address the other criminal conduct in which the defendant engaged that arguably did not enter into the determination of the applicable Guidelines range. For the reasons discussed in the December 13 submission, an upward departure under 5K2.0 or 5K2.21 would be entirely appropriate to address conduct not the subject of the guilty plea, including the attempted arson, and other acts set forth in the section IV, below.

### 2. Understated Criminal History

The nature of the defendant's prior convictions, as set forth in the PSR, and the range of other criminal conduct in which the defendant has been involved, see discussion below at 12-14, strongly suggest that a Criminal History category of III underrepresents the defendant's criminal past and his likelihood of recidivism. A more detailed discussion of the reasoning behind the departure is set forth in the December 13 submission. If the Court were to find that defendant's criminal history category were increased from III to VI, the corresponding sentencing range for a total offense level 29 would increase to 151-188 months on this ground for departure alone.

In short, taking into account both the aggregating factors for departure discussed above and the understated criminal history, the government submits that the factual record provides more than sufficient basis for the Court to depart to a sentence of up to 210 months. Moreover,

as this sentence is consistent with the Guidelines and the purposes set forth in 18 U.S.C. § 3553(a), a sentence of up to 210 months incarceration would be reasonable.

*2. Downward Departures*

The government submits that the defendant is not entitled to a downward departure for the reasons set forth in its December 13, 2004 submission.

**IV.  Anticipated Approach to Sentencing**

To provide support for the requested upward departures, the government intends to introduce certain evidence at sentencing, including the tape recordings of the defendant and letters sent by the defendant.  Attached to this memorandum are transcripts of the recordings the government would seek to play at sentencing and letters the government will introduce.  These materials were previously provided to defense counsel on or about December 10, 2004.  The materials include the following:

Transcripts of Recordings

* EOO1 (Conversation One).  Conversation between Echevaria and the defendant in late June or early July 2003.

* E001 (Conversation Two)   Conversation between Echevaria and the defendant in late June or early July 2003.

* E002.  Conversation between Echevaria and the defendant on July 28, 2003.

* E005.  Conversation between ATF Special Agent Sullivan and the defendant on August 1, 2003.

* EO17.  Conversation between CI and the defendant at the Wyatt Detention facility on or about January 22, 2004.

Letters

* Dated Sept. 10, 2003.  The defendant writes his mother from BCC.

* Dated Sept. 22, 2003.  The defendant writes his mother from BCC.

* Dated Sept. 24, 2003.  The defendant writes his mother from BCC.

* Dated January 21, 2004.  The defendant writes his mother from BCC.

* Dated January 24, 2004.  The defendant writes his mother from Wyatt.

* Dated April 19, 2004.  The defendant writes a friend Doug Kay from Wyatt.

The government submits that the Court can make any necessary findings based on the PSR and the attached documentary record.  The most probative sections of the attached record are as follows:

    1.  The defendant, with racial animus, plots to burn down his neighbor's house.  EOO1 at 17; E001 (Conv. 2) at 10;  E002 at 16-17; E005 at 2.

    2.  The defendant plots the killing of Echevaria, Vontell, Bissett and Baldino.  E017 at 31-32. Letter dated Sept. 10, 03 (plots killing Echevaria); Letter dated Sept. 22, 2003 (plots intimidating Bissett and Baldino); Letter dated Sept. 24, 2003 (plots killing Echevaria and Vontell); Letter dated Jan. 21, 2004 (plots killing Echevaria); Letter dated Jan. 24, 2004 (plots killing Echevaria).

    3.  The defendant discusses killing witnesses when he gets out, including state detective and Echevaria .  E017 at 24-25.

    4.  The defendant discusses tampering with witnesses in a previous case. Letter dated Jan. 24, 2004.  The defendant discusses prior scheme to kill a government witness, but were stymied when the witness died of cancer soon after the trial.  Letter dated Apr. 19, 2004.

    5.  The defendant discusses having an additional 19 guns in Florida.  EOO2 at 45; E017 at 7, 11.

    6.  The defendant discusses interest in obtaining a silencer. E003 at 11.  The defendant acknowledges having purchased "lead gloves" to facilitate beating persons up. E017 at 45.  The defendant discusses getting another gun when released from custody.  E017 at 70.

7. The defendant describes sitting on his porch, shooting his 22 caliber gun into the kitchen of a restaurant behind his house on the Fourth of July, firing over 20 times. E017 at 12. The defendant brags about shooting out the windows in his neighbor's house. EOO1 (Conv. 2) at 7. E017 at 12. The defendant describes shooting high powered air guns at police cars. E017 at 13. The defendant describes shattering windows of cars driving on the highway behind his house. *Id.* at 14.

8. The defendant describes putting an old tire in the middle of the highway, running back to his porch and seeing the two cars skid and almost get in an accident and a third car running over the tire. E017 at 14.

Defense counsel has requested that the tapes be played in open court and that counsel be provided an opportunity to cross examine certain participants to the conversations. To expeditiously present the relevant evidence, the parties have discussed the manner of presentation and propose that the government play the relevant recordings, that the defendant call and cross-examine the witness that may have participated in the recording, and the government conduct a subsequent brief examination, if needed. It is the government's understanding that the parties agree to the authenticity and admissibility of the recordings and letters, and the defendant will not object to the government identifying the date, time, location and parties to the recordings and letters. To the extent that the defendant concludes at or before the hearing that only a shorter portion of the recordings need be played, the government would anticipate not having objection to truncating the proceeding and relying solely on the transcripts.

V.    Conclusion

For the reasons stated above, the government submits that the Court if it chooses to do so has discretion to upwardly depart to a sentence of up to 210 months incarceration on the existing record. The government further submits that the defendant has not offered a legitimate basis for

downward departure on the present facts. In short, the government respectfully requests that the Court upwardly depart and impose a sentence between 135 and 210 months incarceration. To the extent that the Court chooses to impose a Guidelines sentence and not apply a departure, the Government requests, pursuant to the parties' agreement, that the Court impose the sentence of 135 months incarceration.

                              Respectfully submitted,

                              KEVIN J. O'CONNOR
                              UNITED STATES ATTORNEY


By:    CHRISTOPHER W. SCHMEISSER
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. CT14806
        157 Church Street, 23rd Floor
        New Haven, CT  06510
        Tel.: (203) 821-3754
        Fax: (203) 773-5378
        christopher.schmeisser@usdoj.gov

        KEITH A. KING
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. 14211
        157 Church Street, 23rd Floor
        New Haven, CT  06510
        Tel.: (203) 821-3700
        Fax: (203) 773-5378

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 18th day of February, 2005, a true and correct copy of the foregoing Memorandum and attachments was served via FedEx or hand delivery to the following persons:

Norman Pattis, Esq.
649 Amity Rd.
Bethany CT 06524

Carla Jo Wagenstein-Vega
U.S. Probation Officer
U.S. Probation Office
United States Courthouse
915 Lafayette Blvd.
Bridgeport, CT 06604


By: _____
     CHRISTOPHER W. SCHMEISSER