UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA  : | |
| v.                       : | No. 3:03CR228 (JCH) |
|                          : | November 30, 2006 |
| RAYMOND DELVECCHIO       : | |

**GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANT'S ORIGINAL PETITION FOR WRIT OF HABEAS CORPUS**

Comes now the United States, by and through its undersigned attorneys, to respond to the Petition of Writ of Habeas Corpus, filed by the defendant, Raymond Delvecchio in the above-captioned case. The Government believes that the defendant's Petition for Writ of Habeas Corpus is devoid of merit and should be denied.

**BACKGROUND FACTS**

The investigation of Raymond DelVecchio began on or about July 21, 2003, when members of the Derby Police Department received a complaint from Mr. Vontell. Mr. Vontell stated that he had receive information from a confidential source (CI-1) that Raymond DelVecchio who resides at 28 Bank Street, Derby, Connecticut had offered money to CI-1 to burn down Vontell's rental property on Jennings Street. CI-1 also stated that Raymond DelVecchio wanted to shoot Mr. Vontell.

During the course of the investigation, Special Agents with the ATF("agents") also talked to CI-1 and other witnesses and obtained statements which confirmed that Raymond DelVecchio had in

fact offered money to CI-1 to burn down Vontell rental property and had also threatened to harm Mr. Vontell.

During the course of the investigation, ATF agents learned that DelVecchio wanted to burn down Mr. Vontell's property because he was concerned that Mr. Vontell might rent the property to individuals who were African-American. The investigation also revealed that Mr. DelVecchio may be associated with the Klu Klux Klan (KKK).

On July 23, 2003, ATF agents met with CI-1 who informed them that Raymond DelVecchio had approached a number of individuals and solicited their assistance in committing an arson on Robert Vontell's property. CI-1 also stated that on one occasion (he/she) observed Raymond DelVecchio in possession of a Colt .22 cal. pistol, another handgun and a rifle. DelVecchio stated to CI-1 that he possessed as much as 18 additional guns.

On July 29, 2003, ATF agents were informed by CI-1 that he had a recording of a conversation that he/she had with Raymond DelVecchio. In that recording which agents believed to be authentic, Raymond DelVecchio is heard talking about his knowledge of other unsolved crimes and states that he also has a Glock pistol.

On July 30, CI-1 contacted Raymond DelVecchio and told him that he had a friend who was interested in committing the arson if he (DelVecchio) agreed to allow him to use a gun to commit a

robbery.

On August 1, 2003, ATF agents and other law enforcement personnel met with CI-1 and introduced him/her to SA James Sullivan who was working in an undercover capacity and posing as a friend of CI-1. The plan was to introduce SA Sullivan to Raymond DelVecchio as the friend of CI-1 who was interested in carrying out the arson.

On August 1, 2003, Raymond DelVecchio met CI-1 and SA Sullivan near his residence. SA Sullivan and CI-1 saw Delvecchio enter his house located at 28 Bank Street, Derby, Connecticut and come out a few moments later with a white plastic bag. When DelVecchio reached CI-1 and SA Sullivan, he placed the white plastic bag on the ground near SA Sullivan and told him that there was a gun inside the bag. DelVecchio also informed SA Sullivan away from CI-1 that the gun was stolen and that he (DelVecchio) wanted a portion of the profits from the robbery and his gun back after SA Sullivan committed the robbery. SA Sullivan asked DelVecchio for another gun and DelVecchio stated that was not part of the deal. SA Sullivan and DelVecchio exchanged phone numbers to enable them to contact each other at a later date. DelVecchio stated that his telephone number was (203)735-4301. The investigation revealed that the subscriber information on phone number (203) 735-4301 revealed that number is registered to Raymond DelVecchio, 28 Bank Street, Derby, Connecticut.

SA Sullivan examined the contents of the plastic bag that he

had received from DelVecchio and discovered a plastic gun case that contained a Colt Model 22, .22 LR Caliber Pistol Serial Number PH32331. The firearm was also loaded with ten rounds of .22 Caliber ammunition.

On August 4, 2003, CI-1 informed agents from ATF that DelVecchio had approached him several times and appeared very agitated and said that he wanted his gun back because he had given the individual the wrong gun. On that same day, SA Sullivan contacted DelVecchio and DelVecchio told him he wanted the gun back. DelVecchio also stated that if someone was trying to set him up he would kill them.

On August 5, 2003, CI-1 stated to agents from ATF that he had spoken with DelVecchio who was extremely agitated and stated that he would kill SA Sullivan if he did not get his gun back by Wednesday, August 6, 2003.

During the course of our investigation, agents with ATF also discovered that on or about June 5, 1981, Raymond DelVecchio was convicted of Arson in the First Degree, which is a felony and sentenced to 15 to 30 years of incarceration.

The investigation also revealed that on November 4, 2002, a burglary report was filed with the Derby, Connecticut Police Department which indicated that a burglary had occurred on October 24, 2002 and among other things, two (2) firearms were stolen including a Colt .22 Caliber Pistol, Serial Number PH32331 from 20

Bank Street, Derby, Connecticut.

Agents with ATF also conducted a complete trace of the aforementioned firearm and ammunition and found that both had traveled in interstate commerce. In addition, on August 7, 2003, the defendant was arrested and his residence was search pursuant to a federal arrest and search warrant. As a result of the search, over 20 firearms and over two thousand rounds of ammunition were seized. Since his arrest, the defendant has admitted to illegally owning many of the firearms.

On or about August 8, 2003, DelVecchio was detained at the Bridgeport Correctional Center ("BCC"). Agents interviewed several inmates at the BCC who have talked to DelVecchio since he has been in custody. According to several of the inmates, DelVecchio, while in that facility, solicited a number of individuals to kill CI-1 and SA Sullivan.

In this regard, one inmate, CI-2, agreed to commit the hit once he is released from custody. According to CI-2, DelVecchio gave him a letter to mail to his mother that instructed her (the mother) to pay for the purchase of a gun to commit the murder. (A search warrant was executed on DelVecchio's mail and an explicit letter seeking the murder of CI-1 and SA Sullivan has in fact been seized.)

On September 22, 2003, investigators arranged for CI-2 to record his conversations with DelVecchio at the BCC. CI-2

indicated that during that recorded conversation DelVecchio reiterated his desire to have CI-1 killed as well as SA Sullivan.

The investigation also revealed that DelVecchio also gave CI-2 a letter that had additional plans about the plot to kill CI-1 and SA Sullivan and requested that he (CI-2) mail that letter to his mother Concetta DelVecchio, 28 Bank Street, Derby, Connecticut, 06418.

CI-2 also indicated that there was another letter mailed to the defendant's mother that has maps of the area and other information about the defendant's plot to kill CI-1. In this regard, on September 30, 2003, representatives from BCC received two additional letters from Ms. DelVecchio to the defendant, and from the defendant Raymond DelVecchio, Jr., to Ms. DelVecchio. Those two letters also contained additional information about the defendant's plot to kill various witnesses in this case.

In October or November of 2003, the defendant was transferred to Wyatt Detention Center, Central Falls, Rhode Island. A confidential witness ("CW") there stated that the defendant, Raymond DelVecchio had approached him on several occasions and asked him if he could kill a Special Agent and a witness in his case. The CW indicated that he could carry out his wish or have someone on the outside take care of the Special Agent and the witness for him/her.

On January 10, 2004, several of the defendant's outgoing calls were subpoenaed in connection with these new threats against the aforementioned agent and witness to corroborate the CW's statements. On January 15, 2004, many of the calls were listened to by agents with ATF who heard incriminating statements made by the defendant that corroborated the CW's statements regarding the defendant's plot to kill witnesses connected to his case. In addition, the CW and the calls also indicate that the defendant was communicating these threats to his mother through the mails and trying to get her (Mrs. DelVecchio) to assist in the plan.

As a result of the extensive aforementioned investigation, on May 26, 2004, a grand jury sitting in New Haven, Connecticut, returned a Twenty-One Count Third Superseding Indictment which charged the defendant with: Interfering with Housing (Count One); Attempting to destroy a building with fire (Count Two); Threatening to murder a federal law enforcement officer (Count Three); Retaliating against an informant (Counts Four and Five); Tampering with a witness (Count Six); Mailing threatening communications (Count Seven); and Possessing firearms and ammunition as a convicted felon (Counts Eight through Twenty-One).

## **Argument**

The defendant's motion should be denied since he waive his right to collaterally attack the sentence and his motion is substantively devoid of merit.

## **Discussion**

The defendant knowingly and voluntarily waived his right to appeal or collaterally attack his sentence (which specifically included a motion under 28 U.S.C. §2255). On September 22, 2004, the defendant pled guilty to threatening a federal agent and possessing numerous firearms as a convicted felon. As part of defendant's plea agreement, defendant agreed to waive his right to appeal or collaterally attack any sentence of 210 months or less and the Government agreed to dismiss various counts of the indictment. See Exhibit A (Plea Agreement Paragraph 5) On February 23, 2005, the Court sentenced the defendant to 174 months of incarceration and three years of supervised release. Defendant filed this motion to dismiss under 28 U.S.C. § 2255 appeal (despite waiving his right to do so) on August 31, 2006.

The Government respectfully requests that the Court dismiss this appeal filed by the defendant, consistent with the defendant's waiver of appellate rights and right to collaterally attack sentence contained in his plea agreement.

The Second Circuit has long recognized that, "[I] n no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless."

United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir. 1993) (dismissing the defendant's appeal consistent with his waiver in the plea agreement). A waiver is generally enforceable against the defendant as long as the record clearly demonstrates that the defendant knowingly and voluntarily waived his right to appeal. United States v. Granik, 386 F.3d 404, 411 (2d. Cir. 2004) (holding that although the defendant had reservations regarding the calculation of his sentence, he willfully and knowingly waived his right to appeal). See United States v. Morgan, 386 F.3d 376, 378-79 (2d Cir. 2004) (holding that the appellate waiver was enforceable, which the magistrate judge had discussed at length to ensure that the defendant was waiving his rights knowingly and voluntarily).

On September 24, 2004, at the change of plea hearing, the defendant stated both that he understood the waiver of his right to appeal and that he was entering into the plea agreement knowingly and willfully. See Exhibit B (Change of Plea Transcript)  Since the defendant was sentenced to a term less than the 210 month threshold for reserving his right to appeal, the defendant's appeal waiver should be enforced and his appeal should be dismissed. See Exhibit C and D (Sentencing Hearing Transcript and Judgment of Conviction)  In addition, the defendant received other substantial benefits under the plea agreement as a result of the Government's reliance on defendant's agreement to plead guilty and give up

9

certain rights, including his right to collaterally attack sentence or appeal if the sentenced imposed was less than 210 months. In this regard, the Government among other things, dismissed various charges in the indictment pursuant to the plea agreement. See Exhibit E (Third Superseding Indictment)

Furthermore, the Court, who accepted his guilty plea, went to great pains to ensure that the defendant understood the nature of the rights that he was waiving. Specifically, the Court addressed the waiver of the defendant's right to appeal in great detail and the defendant acknowledged that he understood these rights. (See Exhibit B) As a result, the Court specifically found that the defendant's waiver was knowing and voluntary. Therefore, the defendant's motion to dismiss should be denied.

### The defendant's motion is also devoid of merit and should be denied Since 922 (g)(1) is not Unconstitutional.

The Government found the defendant's legal claim to be very ambiguous and confusing. To the extent, however, the defendant is arguing that 922(g)(1) is unconstitutional in that it violates the 2nd Amendment to the Constitution, his motion should be denied. The constitutionality of 922(g)(1) has already been challenged and affirmed in Supreme Court's ruling in United States v. Lopez, 115 S. Ct. 1624 (1995).

It is clear that the Commerce Clause permits Congress to legislate in areas that substantially affect interstate commerce.

Congress did not exceed its authority under the Commerce Clause in enacting 18 U.S.C. § 922(g)(1). Id. at 1624. Within certain limits, Congress has the authority to regulate pursuant to the Commerce Clause. However, Congress must exercise its power under the Commerce Clause, in such a manner that it does not violate rights reserved for the states pursuant to the Tenth Amendment to the United States Constitution. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937).

In Lopez, the Supreme Court reviewed the constitutionality of 18 U.S.C. § 922(q), and recognized three broad categories of activities that Congress may regulate under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities which "substantially affect interstate commerce." Id. at 1629. The Court then identified category three as the only category that could have given Congress the authority to enact § 922(q). Id. at 1629. The Supreme Court held that 18 U.S.C. § 922(q) was unconstitutional because there was not a sufficient nexus between the activity sought to be regulated and interstate commerce. In reaching its conclusion, the Court stated that 18 U.S.C. § 922(q) neither regulates a commercial activity, nor contains a requirement that the possession of a firearm within a school district, be connected in any way to commerce. Id. at 1626. The Court in Lopez also emphasized that 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. Id. 1630-31.

Contrary to the defendant's position, Lopez does not support the proposition that § 922(g)(1) is unconstitutional.

18 U.S.C. 922(g) which is the statute in question in this case, should also be reviewed for its constitutionality under the third category as an activity that "substantially affects interstate commerce." In that regard, 18 U.S.C. 922(g) is clearly distinguishable from the 18 U.S.C. 922(q), the Lopez statute, because it contains a requirement that the possession be connected to commerce. The jurisdictional element in this case would therefore ensure, on a case-by case basis, that possession of a firearm affects interstate commerce. The Supreme Court clarified its analysis by distinguishing its ruling from United States v. Bass, 404 U.S. 336 (1971), where the Court held that Congress had sufficient authority to prohibit felons from possessing firearms, provided that the relevant statute required the possession to be in, and affecting, interstate commerce. Id. at 1631[1] In addition, in United States v. Hanna, 55. F.3d 1456, 1462 & n.2 (9th Cir. 1995), it was held that Lopez does not affect the constitutionality of § 922(g)(1). The distinguishing factor being § 922(g) requires the government to prove that the firearm, possessed by the convicted felon, affects interstate commerce. This is not an element of the Lopez statute. In this regard, the courts have held that if the statute has as one of the elements, that the government must prove that the weapon was in, or affecting commerce, then it

---

[1] The statute addressed in U.S. v. Bass, was the predecessor to 18 U.S.C. § 922(g).

is sufficient.  <u>Scarborough v. United States</u>, 431 U.S., 563 (1977) clearly articulated that Congress intended that no more than a minimal nexus, which is satisfied by a showing that the possessed firearm, traveled in interstate commerce at some point, is sufficient.  The Supreme Court in <u>Scarborough</u>, under the statute making it a crime for a convicted felon to possess "in commerce or affecting commerce" any firearm held:

> "proof that the possessed firearm previously traveled at some time in interstate commerce was sufficient to satisfy the required nexus between possession and commerce."

The Government maintains that the defendant's constitutional challenge must fail and defendant's motion to dismiss the 922(g)(1) counts in the indictment must be denied.

## **Conclusion**

The defendant's Original Petition for Writ of Habeas Corpus is devoid of merit and should be denied for the aforementioned reasons.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


KEITH A. KING
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT14211
157 Church Street, 23rd Floor
New Haven, CT  06510
Tel.: (203) 821-3700
Fax: (203) 773-5376



CHRISTOPHER SCHMEISSER
Federal Bar No.: ct14806
U.S. Attorney's Office
915 Lafayette Blvd., Rm. 309
Bridgeport, CT 06604
Tel: (203) 696-3037

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of November, 2006, a copy of the foregoing was sent first-class mail to:

Pro se defendant, Raymond Delvecchio-15254-014
       FCI Fairton
       P.O. Box 420
       Fairton, NJ 08320


       KEITH A. KING
       ASSISTANT U.S. ATTORNEY